**LAKESIDE MALL, LTD., an Alaska limited partnership; Paul Neal III a/k/a Tony Neal, an individual; and Neal & Company Inc., an Alaska corporation, Appellants,**

v.

**Robert B. and Theresa R. HILL; Jack F. Brent; William J. Winn Family Trust; Ronald A. Hill; Kenneth D. and Mary Lou Feenstra; Evelyn W. Hopkins; Ben F. Smith, Jr., as partners of Lakeside Company, Appellees.**

No. S–4319.

Supreme Court of Alaska.

March 6, 1992.

---

David P. Gorman, Wade & DeYoung, Anchorage, for appellants.

Peter J. Maassen, Burr, Pease & Kurtz, Anchorage, for appellees.

Before: RABINOWITZ, C.J, and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

In this foreclosure action, the Neal defendants appeal the superior court's grant of summary judgment dismissing their third party indemnity claims against the Lakeside partners.[1] The issue we address is whether Neal, previously a purported "limited partner" himself, may raise various statutory filing defects to claim that Lakeside Company was not properly formed as a limited partnership and there-

by expose the remaining "limited partners" to liability as general partners. Based on a natural extension of our reasoning in *Betz v. Chena Hot Springs Group*, 657 P.2d 831 (Alaska 1982), we hold that a former partner in a purported limited partnership is estopped to deny the existence of a limited partnership among the partners *inter se* for the purpose of imposing general partnership liability on his former co-partners.

I

In March 1978, Lakeside Mall, Ltd., an Alaska limited partnership controlled by the Neal defendants, secured financing from National Bank of Alaska (NBA) to purchase property and build a shopping mall in Homer. The 1.575 million dollar loan was secured by a promissory note and a deed of trust signed by one Neal defendant in his capacity as general partner of Lakeside Mall, Ltd. and by the other Neal defendants as guarantors of the note and deed.

In 1979, Charles Harding, a Homer resident, formed Lakeside Company to purchase and operate the shopping mall. Harding recruited friends and relations from California to invest in the company as "limited partners." On August 17, 1979, Neal, acting on behalf of Lakeside Mall, Ltd., conveyed the mall property to Lakeside Company. Harding, as general partner of Lakeside Company, executed the deed which contained a hold harmless clause designed to indemnify the Neal defendants from exposure as guarantors of the NBA note and deed of trust. As partial consideration for its sale of the mall, Lakeside Mall, Ltd., received a 30% "limited partnership" interest in Lakeside Company.

At the time of conveyance, the other Lakeside partners had not made their capital contributions or executed the partnership agreement, and the Certificate of Limited Partnership had not been recorded in

---

1. There are numerous individuals and business enterprises involved in this complex foreclosure action. We adopt the convention used by the parties themselves to refer collectively to the third party plaintiffs (appellants here) as the "Neal defendants" or "Neal." For ease of refer-

ence, we use the masculine singular pronoun to refer to the collective "Neal." The third party defendants (appellees) are the purportedly limited partners of Lakeside Company and are referred to as the "Lakeside partners" or "partners."

Los Angeles as required by its terms. The other Lakeside partners executed the partnership agreement and made their contributions within two months of the conveyance. Harding filed the certificate in Homer in October 1979. However, the certificate was not filed in Los Angeles County until September 1981.

On October 29, 1979, NBA, Lakeside Company, and the Neal defendants entered into an assumption agreement whereby Lakeside Company agreed to assume the note and deed of trust.[2] However, NBA did not agree to release the Neal defendants from their obligations as original borrowers or guarantors.

In 1981, Neal and Harding had a dispute over management of the mall property. Neal brought an action against Harding, Lakeside Company, and the other Lakeside partners to recover his investment in Lakeside Company. He also sought damages for misrepresentation and various other remedies.[3] The parties settled the 1981 action and stipulated to dismiss the case with prejudice. The settlement provided that Harding would buy out Lakeside Mall's partnership interest and undertake "reasonably necessary" steps to secure release of the Neal defendants from the underlying debt to NBA.[4] At the time of the settlement, the Certificate of Limited Partnership was on file in Los Angeles and Homer, and all partners had made their capital contributions and signed the partnership agreement.

From 1982 until 1986, Harding and Lakeside Company ran the shopping mall and serviced the mortgage. However, with the severe economic downturn that hit Alaska in 1986, the company could not meet its debt payments and eventually defaulted on the loan. In 1988, NBA made a demand for payment on the Neal defendants in their various capacities, and when they failed to pay, brought a foreclosure action against Lakeside Mall as the original debtor, the Neal defendants as guarantors, and Lakeside Company under its 1979 assumption agreement.

Neal filed cross-claims and third party claims against Harding, Lakeside Company, and the Lakeside partners based on the hold harmless clause in the 1979 warranty deed. In his claim against the Lakeside partners, Neal's theory was that the Lakeside Company was not properly formed as a limited partnership when the 1979 deed was executed and therefore all the partners were "general partners" and obligated under the hold harmless clause.

The Lakeside partners moved for summary judgment on the third party claims against them. Among other things, they claimed: 1) that the Neal defendants were estopped to deny the validity of the limited partnership or their status as limited partners, and 2) that the claims were barred by the 1981 settlement under the doctrines of res judicata and/or collateral estoppel. The Neal defendants cross-moved for summary judgment on the issue of the Lakeside partners' status as limited or general partners.[5]

While the cross-summary judgment motions were pending, the Neal defendants settled with NBA. In August 1990, the trial court granted the Neal defendants' summary judgment motion against Harding and Lakeside Company but also granted the Lakeside partners' motion against the Neal defendants. The trial court found

---

2. The agreement specifically refers to Lakeside Company as a "California Limited Partnership." Harding executed the agreement as "General Partner" for the company.

3. The central theories of Neal's case were: 1) that Harding misrepresented to Neal that the limited partnership was properly formed under California law at the time of conveyance; 2) that Harding's failure to file the certificate in Los Angeles was a breach of his fiduciary duty to Lakeside Mall, Ltd., and the other "purported limited partners" because it exposed them to

liability as general partners; and 3) that Harding mishandled certain other properties.

4. The settlement agreement which was signed by all parties, referred to Lakeside Company as a "California limited partnership."

5. In their memorandum in support of the summary judgment motion, the Neal defendants stated, "[f]or the most part, the facts concerning this issue [i.e., the Lakeside partners' liability under the hold harmless clause] are undisputed."

no genuine issues of material fact and ruled that the Neal defendants had "ample notice" of the limited partnership status of the company when they became "limited partners" themselves. The court also concluded that under *Tolstrup v. Miller*, 726 P.2d 1304, 1306 (Alaska 1986), the Neal defendants' "claims regarding unlimited liability are barred by the final order in [the 1981] case." This appeal followed.

## II

The Lakeside partners argue that Neal is estopped to deny the existence of the limited partnership as a former partner who had notice and dealings with Lakeside Company as a limited partnership.[6] Neal contends that the dispositive fact in this case is that the certificate of limited partnership was not on file in Los Angeles when either the warranty deed containing the hold harmless clause or the assumption agreement were executed.[7]

Neal also points out that he was not only a partner in the "purported limited partner-

ship" but was also a creditor of the partnership based on the 1979 sale of the mall property. As a creditor of the partnership, he claims he should be able to rely on the line of cases which holds that a limited partnership exists "only if a certificate of limited partnership is signed and recorded" regardless of whether the creditor had notice of the purported limited partnership status of the company. *Brown v. Panish*, 99 Cal.App.3d 429, 160 Cal.Rptr. 282, 283 (1979).[8] *See also Tiburon National Bank v. Wagner*, 265 Cal.App.2d 868, 71 Cal. Rptr. 832 (1968); *Dwinell's Central Neon v. Cosmopolitan Chinook Hotel*, 21 Wash. App. 929, 587 P.2d 191 (1978). Neal argues that these cases parallel the present action because he is not suing on any rights, remedies or obligations related to his earlier involvement in the partnership as a "purported limited partner" but rather is suing in his creditor capacity to enforce his rights under the hold harmless clause. He asserts that his status as a former partner should be irrelevant to the present action.[9]

---

**6.** Since the facts relating to the limited partner status of the Lakeside partners are undisputed, a question of law is presented. We review a question of law using our independent judgment and adopt the rule which is most persuasive in light of precedent, reason, and policy. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

**7.** Neal points out that the failure to record the certificate violates AS 32.10.010 (1986 & Supp. 1990) which provides:

(a) Two or more persons desiring to form a limited partnership must (1) sign and swear to a certificate ... (2) record the certificate in the office of the recorder for the recording district in which the limited partnership is located.

This section, as well as the remainder of our codified limited partnership law, is taken from the Uniform Limited Partnership Act (ULPA) and is identical to former California Corporations Code § 15502. Neal contends that under the ULPA failure to record the limited partnership agreement results in the formation of a general partnership.

**8.** Neal contends that pre–1983 decisions of the California courts "should be highly persuasive, if not controlling" on the question of the Lakeside Company's validity as a limited partnership because the partnership agreement identifies the company as a "California limited partnership." This may be true if one accepts Neal's premise that he is simply a creditor and the question is a matter of statutory construction;

namely whether the company complied or "substantially complied" with California's version of the ULPA. However all the important events in this case occurred in Alaska. The Neal defendants and Harding are residents of Alaska and only dealt with each other in Alaska; the loan was from an Alaskan bank to finance an Alaskan business; the deed containing the hold harmless clause and the assumption agreement were executed here; and the 1981 action was brought in an Alaskan court. Only the Lakeside partners reside in California, and, apparently, they had no dealings with the company other than their initial contributions and some early returns on their investment.

For the most part, we have adopted the "most significant relationship" test for choice of law issues based on the Restatement (Second) Conflict of Laws approach. *See Ehredt v. DeHavilland Aircraft Co. of Canada*, 705 P.2d 446, 453 (Alaska 1985). The Restatement (Second) Conflict of Laws §§ 292–295 (1971) applies this same test to issues involving the liability of partners *inter se* and when third party creditors are involved. California certainly has an interest in applying its law to business entities specifically organized under its law. However, as far as the Lakeside partners' status vis-a-vis Neal is concerned, our interest is clearly dominant given the overwhelming contacts with this state.

**9.** Neal further contends that the ULPA only provides one "safe haven" for partners who erroneously believe themselves to be limited partners: renunciation. AS 32.10.100 provides:

We disagree with Neal's fundamental premise.

In *Betz v. Chena Hot Springs Group*, 657 P.2d 831, 833 (Alaska 1982), we stated:

> The purpose of the recording requirement is to provide notice to the firm's creditors of a limited partner's circumscribed liability. When a certificate is not filed, most courts hold that a general partnership is formed, with each partner being fully liable for debts of the partnership. While a partner's rights vis-a-vis a creditor may be affected, failure to record the certificate does not, in and of itself, alter the rights of a [partner] vis-a-vis other partners as set out in [a] partnership agreement.

(Citations omitted). Similarly, the Iowa Supreme Court held in *Porter v. Barnhouse*, 354 N.W.2d 227 (Iowa 1984), that the failure to file a cancellation of limited partnership did not effect the date of dissolution as among the partners. Citing *Betz* with approval, the court concluded:

> The statutory requirement for filing a certificate of cancellation ... is a corollary to the requirement for filing a certificate of limited partnership.... It is designed to protect third parties dealing with the partnership. For this reason,

several courts which have considered the issue have concluded that such filing requirements are designed for the protection of third parties and do not affect the rights of the limited and general partners *inter se.*

*Id.* at 231.

Many other jurisdictions have relied on the notice function of the recording requirement to distinguish between claims of defective limited partnership made by partners and those made by third party creditors.[10] *See Hoefer v. Hall*, 75 N.M. 751, 411 P.2d 230, 233 (1966) (purpose of statutory requirement that certificate be recorded is to acquaint third persons dealing with the partnership with essential features of the partnership arrangement); *see also In re Rey Cafe Coffee Services, Ltd.*, 24 B.R. 680 (D.N.M.1982); *Brown v. Brown*, 15 Ariz.App. 333, 488 P.2d 689, 695 (1971); *Riviera Congress Associates v. Yassky*, 25 A.D.2d 291, 268 N.Y.S.2d 854 (N.Y.1966); *Holvey v. Stewart*, 265 Or. 242, 509 P.2d 17 (1973); *Garrett v. Koepke*, 569 S.W.2d 568 (Tex.Civ.App.1978); *Rond v. Yeaman–Yordan–Hale Productions*, 681 P.2d 1240, 1242 (Utah 1984).[11]

Based on our reasoning in *Betz*, we conclude that Neal is estopped, as a matter of

---

[a] person who has contributed to the capital of a business ..., erroneously believing that the person has become a limited partner in a limited partnership, is not by reason of the person's exercise of the rights of a limited partner a general partner ... provided that on ascertaining the mistake the person promptly renounces the person's interests in the profits of the business or other compensation by way of income.

He argues that the Lakeside partners should have renounced their interest in Lakeside Company when they became aware of the filing defects as a result of the 1981 lawsuit.

**10.** The fact that a partner's rights and obligations may be different depending on who challenges the entity, a partner or a creditor, flows from the fact that the ULPA was meant to abrogate the common law rule that "an abortive attempt to create a limited partnership resulted in a general partnership." 59A Am.Jur.2d Partnership § 1276 (1987). Courts achieved a result similar to the old rule when creditors were involved by "saying that, while a limited partnership was formed, the limited partners are liable as if they were general partners." *Id.* However "when no rights of a creditor are involved, the partners are usually held to their

agreement unless they can show that they were injured by the fact that ... no certificate of limited partnership ... was ever filed at all." *Id.* at § 1278.

**11.** Neal points out the string of cases relied on by the Lakeside partners do not involve the question of limited liability but rather involved other agreements made by partners in the partnership agreements. For the most part this is true; however, the Ninth Circuit Court of Appeals (applying Arizona law) at least contemplated that the same rule would apply when liability was the issue. In *Heritage Hills v. Zion's First Nat'l Bank*, 601 F.2d 1023, 1026 (9th Cir.1979), the court commented:

> The fact that it was not a limited partnership means no more than that the liability of the limited partners upon obligations of the partnership had not effectively been limited to the amounts they had subscribed in the venture. *While the intended partners might among themselves rely upon their agreement as to the limited nature of their liability, all of the partners had general liability insofar as third parties were concerned.*

(Emphasis added).

law, from claiming that the Lakeside partners are general partners and liable under the hold harmless clause.[12] The undisputed facts of the case establish that Neal accepted a limited partnership interest in the company on the same day that the deed containing the hold harmless clause was executed. He was a partner when the assumption agreement was signed and during the entire period when the defects that he complains of existed.[13] When he left the partnership, the Certificate of Limited Partnership was recorded and all statutory requirements were essentially satisfied.

Since the estoppel theory is sufficient to support the superior court's order granting summary judgment in favor of the Lakeside partners, it is not necessary for us to discuss the substantial compliance and collateral estoppel arguments raised by the parties. The superior court's order is AFFIRMED.

**12.** This situation does not fit neatly under either the doctrine of equitable or quasi-estoppel but has elements of both. We recently discussed the requirements for both types of estoppel in *Sea Lion Corp. v. Air Logistics of Alaska, Inc.,* 787 P.2d 109, 114 n. 2 (Alaska 1990):

> Traditional [i.e., equitable] estoppel requires the assertion of a position by conduct or word, reasonable reliance thereon by a party, and resulting prejudice. Quasi-estoppel precludes a party from taking a position inconsistent with one taken previously when circumstances render the assertion of [the second] position unconscionable.

Here there is no question that a business entity of some kind was formed on the day Neal and Harding executed the deed and Neal certified that Lakeside Mall, Ltd., had itself become a limited partner of Lakeside Company. In addition, Neal has never claimed that he suffered any injury as a result of the filing defects.

**13.** Significantly, in the settlement agreement Neal signed to end the 1981 litigation, Lakeside Company was identified as a limited partnership. This conveyance occurred *after* Neal became aware of the filing defects. In other words, he sold his partnership interest as a *limited partnership interest* and therefore failed to do what he claims the other partners should have done namely renounce his interest under AS 32.10.100.